PHILIP W. BOESCH, JR. (State Bar No. 60608)
MICHELLE VIZURRAGA (State Bar No. 224009)
BENJAMIN C. JOHNSON (State Bar No. 218518)
THE BOESCH LAW GROUP
225 Santa Monica Blvd., 11th Floor
Santa Monica, CA 90292
Telephone: (310) 578-7880
Fax: (310) 578-7898

Attorneys for Defendants
OPUS UNLIMITED, INC. and
BLAKE CHRISTENSEN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 1021018 ALBERTA LTD., a numbered Alberta, Canada corporation, | Case No. CV10-976 GW (AGRx) |
| Plaintiff, | **DECLARATION OF BLAKE CHRISTENSEN FILED IN SUPPORT OF JOINT MOTION TO DISMISS OF DEFENDANTS OPUS UNLIMITED, INC. AND BLAKE CHRISTENSEN** |
| v. | |
| OPUS UNLIMITED, INC., a California corporation; BLAKE CHRISTENSEN, an individual; and DOES 1-10, inclusive, | |
| Defendants. | Date:      May 27, 2010<br>Time:      8:30 am<br>Place:     Courtroom 10 |

*The Boesch Law Group*
*225 Santa Monica Boulevard, 11th Floor*
*Santa Monica, California 90401*

## DECLARATION OF BLAKE CHRISTENSEN

I, Blake Christensen, declare as follows:

1.     I am one of the Defendants named in Case No. CV-10-976-GW, *1021018 Alberta Ltd. v. Opus Unlimited, Inc. et al.*  I am a resident of Florida. I do not own property or reside in California.  I make this Declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.  I make this Declaration in support of Defendants' Joint Motion to Dismiss in the above-referenced case.

2.     I was not personally served with the Complaint.  I do not live at 1569 Roscomare Road, Los Angeles, California 90077.  I have not lived there since 1997.  I have lived in Florida for the past 13 years and currently reside there.  I do not live in California or own any property in California.

3.     I am the President of Opus Unlimited, Inc.  Opus is a Florida company with a principal place of business at 8951 Bonita Beach Rd., SE, Suite 525, #118, Bonita Beach, Florida 34135.  Opus is a registered foreign company with the State of California.  Attached at Exhibit 1 is a true and correct copy of the Statement and Designation by Foreign Corporation that was filed with the California Secretary of State.

4.     I have reviewed the Complaint that was served on Opus Unlimited, Inc. via its registered agent.  Neither I nor Opus have ever

The Boesch Law Group
225 Santa Monica Boulevard, 11th
Santa Monica, California 90401

possessed the funds that Plaintiff claims are due in the Complaint.  The merchant processing company referred to by Plaintiff therein is CS Payments, an Icelandic company.  Opus is not a merchant processing company and did not contract with Plaintiff.

5.     In 2008, I signed a Contractor Referral Agreement with CS Payments to work as an independent contractor to refer potential merchants to this company for merchant processing services.  Attached hereto at Exhibit 2 is a true and correct copy of my Contractor Referral Agreement with CS Payments.

6.     As part of my responsibilities as an independent contractor with CS Payments, I worked with prospective merchants in obtaining their completed Merchant Applications.  In the ordinary course of my business, I explain to prospective merchants that I am not the processor or the bank and their Merchant Application must be approved by the third-party processor and bank.  Once the Merchant Application is approved by the third-party bank, the merchant processor, in this case, CS Payments, requires all Merchants sign a contract for services.  As part of my responsibilities as an independent contractor for CS Payments, I send the Merchant Application and Processor Terms and Agreement to the merchants for completion and return to CS Payments.

The Boesch Law Group
225 Santa Monica Boulevard, 11th
Santa Monica, California 90401

3

7.    In or about May-June 2009, I referred Mr. Jesse Willms (the "Merchant") to CS Payments for merchant processing services.  Mr. Jesse Willms applied for merchant processing services with CS Payments for a number of his companies, including Coastwest Holdings (aka Alberta 1021018 Ltd. dba Just Think Media).  I explained to Mr. Willms at that time that I am not the processor or the bank and that his Merchant Application must be approved by both of those entities before he would be accepted as a client.

8.    In or about early June 2009, I sent a Merchant Application and Processor Terms and Agreement to Mr. Willms from CS Payments, which was executed by Mr. Willms on or about June 2, 2009 and returned to CS Payments shortly thereafter.  Attached hereto at Exhibit 3 is a true and correct copy of Mr. Willms Merchant Application with CS Payments.  Attached hereto at Exhibit 4 is a true and correct copy of CS Payments Processor Terms and Agreement that was sent to Mr. Willms as part of his Merchant Application and email from Mike Stef acknowledging Plaintiff's agreement to such terms.

9.    In July 2009, I understand that CS Payments sent welcome letters to Plaintiff (via Mr. Willms) that provided him with information on his new accounts with CS Payments.  Neither I nor Opus has ever had any contract or account(s) with Plaintiff.

DECLARATION OF BLAKE CHRISTENSEN

The Boesch Law Group
225 Santa Monica Boulevard, 11th
Santa Monica, California 90401

10.    On or about August 11, 2009, Mr. Willms asked me when they would start receiving wires from their merchant accounts with CS Payments. That same day, I indicated to Mr. Willms that I would contact the processor (CS Payments) and the bank and find out, as I was not aware that he was even processing.  On August 12, 2009, Mr. Willms responded to me and indicated that they had been processing.  A true and correct copy of the emails between me and Mr. Willms are attached hereto at Exhibit 5.

11.    On August 17, 2009, I received an email from Mike Stef, the VP of Engineering for Plaintiff inquiring about the status of the funds for one of their accounts.  That same day, I indicated to him that I don't send the wires or do any of the reconciliations or banking, as the bank handles this, but I would call the bank and check.  A true and correct copy of the emails between me and Mr. Willms are attached hereto at Exhibit 6.

12.    I understand that the bank wired funds to Mr. Willms in July and August 2009 in connection with his accounts with CS Payments.

13.    On November 19, 2009, I received an email from Mike Stef, the VP of Engineering for Plaintiff indicating to me that he had signed a Processing Terms and Agreement with the merchant processor.  (See Exhibit 4).

The Boesch Law Group
225 Santa Monica Boulevard, 11th
Santa Monica, California 90401

5

14.    In August 2009, I understand that CS Payments received a significant number of customer complaints regarding Plaintiff's business practices.  Mr. Willms accounts with CS Payments were closed at shortly thereafter in or about September 2009. After I was informed of the fraud investigation of Mr. Willms and his companies by Visa EU, I ceased corresponding with Plaintiff (Mr. Willms) as to the status of his accounts with CS Payments, as I understood the merchant processor and/or bank(s) were handling the matter directly with him.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: 4/23/2010

BLAKE CHRISTENSEN

The Boesch Law Group
225 Santa Monica Boulevard, 11th
Santa Monica, California 90401

DECLARATION OF BLAKE CHRISTENSEN

EXHIBIT 1

ENDORSED - FILED
In the office of the Secretary of State
of the State of California

## STATEMENT AND DESIGNATION
## BY FOREIGN CORPORATION

JUL 2 3 2008

Opus Unlimited, Inc.
_____
(Name of Corporation)

_____ , a corporation organized and existing under the

laws of _____ Florida _____ ,makes the following statements and designation:
(State or Place of Incorporation)

1.  The address of its principal executive office is _____

   8951 Bonita Beach Rd. SE, Suite 525, #118, Bonita Beach, Florida 34135 _____.

2.  The address of its principal office in the State of California is _____

   _____

## DESIGNATION OF AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA
(Complete either Item 3 or Item 4.)

3.  (Use this paragraph if the process **agent is a natural person.**)

   _____ ,a natural person residing in the State of

   California, whose complete address is _____

   _____ , is designated as agent upon whom process directed to
   this corporation may be served within the State of California, in the manner provided by law.

4.  (Use this paragraph if the process **agent is a corporation.**)

   My Corporation Business Services, Inc. _____ , a corporation organized and existing

   under the laws of _____ California _____ , is designated as agent upon whom process directed
   to this corporation may be served within the State of California, in the manner provided by law.

   **NOTE:  Corporate agents must have complied with California Corporations Code Section 1505
   prior to designation.**

5.  It irrevocably consents to service of process directed to it upon the agent designated above, and to service
   of process on the Secretary of State of the State of California if the agent so designated or the agent's
   successor is no longer authorized to act or cannot be found at the address given.

_____          Blake Christensen, President
(Signature of Corporate Officer)          (Typed Name and Title of Officer Signing)

Secretary of State Form
S&DC-STOCK/NONPROFIT (REV 03/2005)

poration Business Services, Inc. Los Angeles County LOA # LDA-281  ex. 2/17/2010

# State of California
## Secretary of State

## CERTIFICATE OF QUALIFICATION

*I, DEBRA BOWEN, Secretary of State* of the State of California, hereby certify:

That on the 23rd day of July 2008,

### OPUS UNLIMITED, INC.

a corporation organized and existing under the laws of FLORIDA ,
complied with the requirements of California law in effect on that date for the purpose of qualifying to transact intrastate business in the State of California, and that as of said date said corporation became and now is qualified and authorized to transact intrastate business in the State of California, subject however, to any licensing requirements otherwise imposed by the laws of this State.

IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of

July 23, 2008



**DEBRA BOWEN**
**Secretary of State**

*NP-25 (REV 1/2007)*

OSP 06 99731

Page 9

EXHIBIT 2

## CONTRACTOR REFERRAL AGREEMENT

This Agreement is made this 21 day of November, 2008, by and between Blake Christensen an Independent Contractor ("Contractor") and CSPayments ehf ("Company"). The Company is a registered agent of bank(s) that are members of VISA Inc. ("VISA") and MasterCard International, Inc. ("MasterCard").

The purpose of this Agreement is to set forth terms and conditions under which Company may expand its market share by retaining Contractor to assist in marketing its services to such businesses and Contractor shall undertake certain duties and responsibilities in connection with marketing the services. Therefore, in consideration of the above and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Contractor agrees that it is solely an independent contractor and that it understands that no partnership, agency relationship, joint venture or other legal entity or relationship was created or exists between Company and Contractor.

Contractor represents and warrants to Company that Contractor has read and understands the Company Policies as set forth in this Agreement and agrees to the terms set forth herein.

Company reserves the right to amend this Agreement as needed from time to time, and Contractor agrees that any and all such amendments will apply to Contractor immediately upon notice to Contractor of such amendments.

All Contractor's must be 18 years of age or older.

Contractor shall identify prospective Merchants that Contractor believes will meet Company Service Standards and will obtain a pre-application required by Company and/or Bank from said Merchants. Company and/or Affiliates and/or the Bank will collect any and all additional documentation needed from said Merchant (Contractor shall not collect personal information from Merchant on behalf of Company or Bank without the exclusive written consent of Company). Contractor will ensure that all contacts with the prospective and actual Merchants, when made, shall be in compliance with this Agreement and all applicable laws and regulations.  Once a Merchant is approved through the Company and/or Bank, Contractor shall not solicit other Processors to said Merchant. Contractor is responsible for communicating accurate information to prospective Merchants, any misleading information provided to Merchants on behalf of Contractor in order to obtain a Merchant account or to mislead Company and/or any of Company's Affiliates and/or the Bank is cause for immediate termination and all commissions (if any) on said Merchant accounts will immediately cease.

Contractor acknowledges that all Merchant Agreements are to be first approved by Company and will become effective only upon Bank acceptance, at the Bank's sole discretion. Therefore, Contractor will not make any promise to a prospective Merchant that its Merchant Application will be approved prior to Company and the Bank's review and final approval. Any such representations shall constitute a material breach of this Agreement and be cause for immediate termination thereof.

Contractor shall market only to bona fide and lawful businesses in accordance with the Service Standards and this Agreement. Further, Contractor shall promptly notify Company in writing of any adverse information that Contractor receives relating to a Merchant, including information regarding a Merchant's financial condition, use of Cards for any purpose other than payment for the bona fide retail sale of legal goods and services, changes in Merchant's method of doing business, types of goods or services or any other information relating to Merchant that would have a material effect on Merchant's ability to conform to the terms of its Merchant Agreement.

1

Contractor Initials
Company Initials

Contractor acknowledges that performing its duties and obligations under this Agreement confers no rights and equity in any of the Merchant Agreements obtained through the use of Contractor's services. Contractor will be due the agreed commission revenue as long as the Merchants comply with their obligations, responsibilities and duties per the Agreement and the Contractor equally complies with the same.

Contractor agrees to comply with both the Company and the Bank's policies and procedures and with all applicable rules and regulations relating thereto. Contractor agrees that Company, Affiliates, Bank, Card Associations and any agency having jurisdiction over Bank or Company may, from time to time, amend or revise their respective rules, policies and procedures ("Rules"). Contractor hereby agrees to accept and abide by all such amendments and revisions within ten (10) days after receipt of such revisions or immediately if required by the Card Associations or a regulatory agency.

Contractor agrees not to disparage Company, Company products or services, or Affiliates in any manner to any Merchants. Contractor understands that disparagement may result in the immediate suspension or termination of Contractor account with a cancellation of any pending commissions.

Contactor may not refer themselves, their company or to their spouse and receive a commission on said referral. All referrals to which commissions shall be paid must constitute an arms length transaction with a non-related, non-affiliated third party to Contractor.

## UNSOLICITED COMMERCIAL EMAIL ("SPAM") PROHIBITED

Company has zero tolerance toward any Contractor associated with SPAM. The accounts of Contractor associated with SPAM are immediately terminated as soon as the violation is verified, with a cancellation of any pending monies or commissions owed.

For the purpose of this Agreement, SPAM is defined as e-mailing ANYONE, in bulk or by single mailing, about Company or Company's products or services, who has not specifically requested the information directly from Contractor. Mailings to names or lists that have been purchased, including but not limited to so called co-reg lists, regardless of the opt-in procedures, are not permitted. Company considers ANY type of advertisement about Company, Company products or services, posted to a Newsgroup or Chat Room, in violation of their posting rules, to be SPAM.

Contractor agrees to comply with all International, State and Federal spam laws, including but not limited to the Federal CAN-SPAM Act of 2003.

Because damages are often difficult to ascertain, if actual damages cannot be reasonably calculated, Contractor agrees to pay Company liquidated damages of $500 for each piece of spam or unsolicited e-mail transmitted from or otherwise connected with your account, and/or actual damages, whichever is higher, to the extent such actual damages can be reasonably calculated. Company reserves all rights to all other remedies in this regard.

## PAYMENTS

During any period of time in which this Agreement remains in full force and effect, compensation to Contractor will be paid as set forth under this Agreement, assuming that Contractor's activities result in at least one (1) Merchant Agreement in good standing each month. Commissions may be amended without notice due to revisions to interchange and/or assessments and/or because of modifications to the Rules. Company's obligation to pay the compensation set forth in this Section shall arise only at such time as Company receives payment from the respective third parties. Compensation will be paid to Contractor generally 30 days after the end of each month.

2

Contractor Initials
Company Initials 

All Contractor payments will be made in EURO or U.S. dollar. If a sale is canceled or refunded by a Merchant, any paid commission to Contractor will be deducted from the subsequent Commission payment. Contractor commissions will not be paid based upon amounts that are attributable to credit card fraud, credits given to customers, bad debt, right-off amounts and returned goods or cancelled services. Company reserves the right to deduct in subsequent months, any commission paid for a product or service that is subsequently returned or refunded or cancelled, or for any reason where the previous monthly commission was overpaid or later subject to reduction.

Contractor's commission is negotiated on a case-by-case basis and will be paid consistent with customary industry standards for each type of Merchant referred by Contractor to Company. Contractor must have valid identification and bank details on file in order to receive commissions.

Contractor is solely and fully responsible for any and all costs and expenses Contractor incurs in its marketing of the Company and/or Company's products and services, and Contractor agrees to hold Company harmless from same.

## NON-SOLICITATION/ NON-COMPETITION

During the term of this Agreement, Contractor shall not enter into a similar agreement to solicit Merchants to participate in the card processing programs of any bank or financial institution that has an acquiring relationship with Company and/or Affiliates, nor shall Contractor enter into any relationship with any organization or entity that would effect an indirect relationship with any such bank or financial institution. Nor shall Contractor contact, at any time, any of Company Affiliates or Merchants for any reason without the express prior written approval of Company. A violation of this paragraph will result in the immediate termination of this Agreement. This limitation in no way limits Company's right to enter into similar Agreements with other third parties, or with any bank or financial institution that is a member of the Card Associations nor limits Company's ability to enter into a direct or indirect relationship with other organizations, banks or financial institutions solely for the purpose of submitting applications of Merchants.

Contractor hereby agrees that it shall not (i) solicit or provide services to any existing Merchant of Company; (ii) solicit or otherwise cause any Merchant of Company to terminate its Merchant Agreement or terminate receipt of Company; and/or (iii) solicit or market services to any Merchant that is already directly or indirectly provided Card Services by Company and/or Affiliates, whether or not such services are provided under the terms of this Agreement. This Section shall survive for a period of three (3) years following termination of this Agreement.

Contractor hereby agrees to indemnify, defend and hold Company, Affiliates, Bank, Card Associations and the members of the Card Associations harmless from and against any claim, demand, loss, financial or otherwise, damage, liability or cost, including legal fees and expenses, proximately caused by or from: (i) any intentional or negligent misrepresentation by Contractor as to the type of business conducted by a prospective Merchant; (ii) Company and/or Bank's decision not to execute a Merchant Agreement with Merchant referred by Contractor; (iii) negligent investigation/review/acceptance by Contractor of Merchant applications; or (vii) failure to comply with Rules.

## TERM AND TERMINATION

The initial term of this Agreement shall be for a period of one (1) year, commencing on the date first set forth herein, unless earlier terminated by Company.  This Agreement shall thereafter be automatically renewed for an additional terms of one (1) year each unless either party notifies the other no later than ninety (90) days prior to the end of the current term that it does not wish to renew this Agreement.

3

Contractor Initials
Company Initials

Either party shall have the right to terminate this Agreement at any time if:

(a) The other party breaches any of the provisions of this Agreement and fails to cure such breach within thirty (30) days of its receipt of written notice thereof from the non-breaching party; or (b) the other party (i) becomes insolvent; (ii) fails to pay its debts or perform its obligations in the ordinary course of business as they mature; and/or (iii) becomes the subject of any voluntary or involuntary proceeding in bankruptcy, liquidation, dissolution, receivership, attachment or composition for the benefit of creditors. Company shall have the right to terminate this Agreement at any time in the event in which Contractor violates, or Company has reason to believe, that this Agreement has been breached, at the sole discretion of Company.

Contractor agrees not to misrepresent Company products or services. Contractor also agrees not to advertise Company products or services on websites or refer Merchants to Company that Contractor knows promote sexually explicit material, violence, Warez or pirated materials or violate any other copyright, trademark or patent laws, or sites that promote discrimination based on race, sex, religion, national origin, or physical disability or sites that promote illegal activities.

Company may immediately terminate this Agreement for any material default by Contractor with respect to its obligations to comply with Company Rules. Company makes no warranties expressed or implied to the Contractor except as outlined in this Agreement.

If Contractor violates any provision of this Agreement, Company shall have no further obligations for payment of compensation under this Agreement. Further, for any violation or any default under the Agreement that results in Merchants or prospective Merchants receiving Card services from any entity other than Company, Contractor shall, upon demand by Company, be required to pay damages to Company in an amount equal to the revenue that Company would have received from the same. Company's rights under this section shall be in addition to all other rights granted to Company under this Agreement or otherwise available at law or in equity.

Upon termination, Contractor shall return to Company all marketing materials, price lists, customer lists, equipment, supplies and any other Company property in his/her possession at time of termination. Contractor shall not continue to use the names and logos of Company or any of its subsidiaries after termination.

## LIMITATION OF LIABILITY

IN NO EVENT SHALL COMPANY, BANK AND/OR AFFILIATES BE RESPONSIBLE TO CONTRACTOR FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING FROM OR RELATING TO OR AS A RESULT OF ANY BREACH OF THIS AGREEMENT. CONTRACTOR AGREES THAT COMPANY AND/OR BANK AND/OR AFFILIATES SHALL NOT BE RESPONSIBLE TO CONTRACTOR FOR ANY LOSS-OF-PROFIT, DIRECT, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT. IN NO EVENT WILL COMPANY, BANK AND/OR AFFILIATES LIABILITY FOR ANY DAMAGES TO CONTRACTOR OR ANY PERSON EVER EXCEED THE ACTUAL COMPENSATION PAID TO CONTRACTOR PURSUANT TO THIS AGREEMENT REGARDLESS OF ANY FORM OF THE CLAIM OR DISPUTE.

This Agreement shall be governed by and construed in accordance with the laws of the country of Company's location(s), without regard to conflict of laws. Any legal action arising out of this Agreement shall be resolved and enforced under the laws of the Country where the Company is located and filed in said country. Company reserves all rights not expressly granted here.

4

Contractor Initials

Company Initials

## DEFINITIONS, TERMS AND CONDITIONS

● **Amendments.** Except as otherwise provided in this Agreement, no provision of this Agreement may be amended, modified or waived except by a written agreement signed by both parties. Notwithstanding the foregoing, pricing as set forth herein may be amended from time to time at Company's sole but reasonable discretion.

● **Arbitration.** Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be submitted to binding arbitration pursuant to the International Arbitration Rules and procedures then existing before a panel of three arbitrators administered in the country of Company. Any judgment on the award rendered by the arbitrator(s) may be entered in any court having competent jurisdiction thereof. The parties shall split the initial costs of the arbitration. The prevailing party shall be entitled to recover its reasonable legal fees and other costs of suit or arbitration. The parties agree that the arbitration shall commence and conclude within one (1) year from the date of the initial demand, including receipt of any ruling thereon. Service of the demand for arbitration may be made by certified mail or international courier to the parties at the addressed provided herein. If one party refuses to participate in arbitration, the arbitrators shall be entitled to issue an award within ninety (90) days of submission of the initial demand. The parties agree that the arbitrators may issue an order of interim relief, where applicable, such as a preliminary injunction, an order of attachment or other order preserving the status quo until the arbitrators decide the case, and the parties may apply to any court having competent jurisdiction for enforcement of any such interim relief. All awards issued herein shall state the reasons and legal basis for the award, including reference to the process by which the legal basis was selected. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

● **Defined Term: Affiliate.** Any subsidiary or related company of Company and/or Bank.

● **Defined Term: Bank.** Any member of VISA and/or MasterCard that has registered Company and/or Affiliates as its agent to provide Card Services.

● **Defined Term: Card.** A valid credit in the form issued under license from VISA or MasterCard or any other valid credit card, or charge card accepted by Merchant with Company's prior written approval.

● **Defined Term: Card Association.** VISA or MasterCard International.

● **Defined Term: Cardholder.** The person whose name is embossed upon the face of the Card.

● **Defined Term: Card Services.** The operations, policies and procedures of Company and Bank relating to the acceptance and processing of sales through the use of Cards.

● **Confidentiality of Information.** Contractor acknowledges that in performing its obligations under this Agreement, it will be entrusted with certain confidential information concerning Card Services, Bank's and Company and/or Contractor's respective business practices, including but not limited to current and prospective customer lists, products, product development, pricing and marketing strategies ("Information"). Contractor acknowledges that all such Information has commercial value and is proprietary to Bank or Company, as the case may be. Therefore, Contractor agrees to keep all Information confidential and will not disclose any Information to any person except that Contractor may disclose: (a) any portion of the Information that was or becomes generally available to the public other than as a result of a disclosure by Contractor; (b) information for which Bank or Company provides written consent for disclosure. The provisions shall survive any termination of this Agreement.

● **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and such counterparts shall together constitute one and the

5

Contractor Initials
Company Initials

same instrument.

- **Entire Agreement (Binding Effect).** This Agreement including all schedules, exhibits and attachments thereto embodies the entire understanding and agreement of the parties with respect to the subject matter hereof. This Agreement shall be binding upon and shall inure only to the benefit to the parties hereto and their respective successors and assigns. Nothing in this Agreement, express or implied, is intended to confer or shall be deemed to confer upon any persons or entities not parties to this Agreement, any rights or remedies under or by reason of this Agreement.

- **Defined Term: Independent Contractor.** Company and Contractor hereby acknowledge and agree that Contractor will act as an Independent Contractor in the performance of its duties under this Agreement. Nothing contained in this Agreement shall be construed to imply that Contractor, or any employee, agent or other authorized representative of Contractor, is a partner, joint venture, agent, officer or employee of Company.

- **Interpretation.** This Agreement or any section of this Agreement shall not be construed against any party due to the fact that the Agreement or any section of it was drafted by said party.

- **Jurisdiction; Venue; Governing Law.** Jurisdiction and venue for any claim, dispute or cause of action between the parties shall be exclusively located in the country of the Company and this Agreement shall be governed and construed in accordance with the laws of that Country.

- **Notices.** All notices and other communication required or permitted under this Agreement shall be in writing and given by personal-delivery, telecopy (confirmed by a mailed copy) or first-class mail, postage prepaid.

- **Severability.** The invalidity of any section or subsection hereof shall not affect the validity of any other section or subsection hereof.

- **Section Headings.** The section headings contained in this Agreement are for convenient reference only, and shall not in any manner affect the meaning or interpretation of this Agreement.

- **Waiver.** No term or provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other party, whether express or implied, shall not constitute consent to, waiver of, or excuse for any different or subsequent breach.

## SCOPE OF AGREEMENT

The purpose of this Agreement is to secure the services of Contractor to market to businesses that meet the requirements of the Card Associations.

Contractor has no authority to act for or on behalf of Company and/or Affiliates and/or Bank, except as provided for in this Agreement and no other authority or power is hereby granted to or implied to Contractor.

Contractor may not revise, alter, depart or otherwise vary the terms, conditions, prices or policies that are established by Company and set forth in the Merchant Agreement and applicable Policies.

Contractor may not incur any debt, obligation, expense or liability of any kind against a Merchant, Company and/or Affiliate.

Contractor may not receive any money owed to a Merchant. Contractor may not accept payment of any Merchant Fees in his or her name or in any name other than as authorized by Bank and Company. The pricing of Merchant Fees and the establishment of Policies shall be the exclusive right and responsibility of Company.

6

Contractor Initials

Company Initials

WHEREAS, this Agreement is executed by duly authorized officers of the parties and shall be effective as of the date first above written.

**CONTRACTOR**

Bkke Christensen
(Print Full Name)

11/28/2008
(Date)

(Signature)

**COMPANY**

Raiaa Jamei
(Print Full Name)

12/02/2008
(Date)

(Signature)

---

*Contractor's ID Number (Passport; Identification Card) Attach copy hereto

7

Contractor Initials
Company Initials

EXHIBIT 3

# Coastwest Holdings Ltd.

## APPLICATION FORM

| | |
|---|---|
| Merchant Name: JUST THINK MEDIA | Date: JUNE 2, 2009 |

### Merchant Contact

| | |
|---|---|
| Name: JESSE D. WILLMS | Email: jd.jesse@yahoo.com |
| Tel: 780-416-0211 | Fax: 780-416-0218 |

### Merchant and Website Information

| | |
|---|---|
| Company/Website Ownership: | 1021018 ALBERTA LTD. |
| Trading Name (DBA): | JUST THINK MEDIA |
| Company Full Address: | SUITE 240, 11 ATHABASCAN SHERWOOD PARK, AB, CANADA |
| Company/Website ID/Reg. No.: | |
| Date of Registration: | |
| Principal's Name: | Date of Birth: |
| Principal's Home Address: | 627, 62028 RR233 SHERWOOD PARK, AB, CANADA |
| Principals Home phone No.: 780-477-1624 | Percentage of Ownership: 100% |
| Principal's personal e-mail: jd.jesse@yahoo.com | Passport/ID No.: |
| Technical Contact Name: MIKE STEFANIUK | |
| Technical email: mstef@live.ca | Technical Phone: 780-416-0218 |
| Website (URL): | |
| Type of Business (or goods sold): eCommerce | DIETARY SUPPLEMENTS, etc. |
| Recurring Billing: Yes | Currency: US $ |
| Average Ticket: $15.00 | Sales per month: $15,000,000 |
| Maximum ticket: $20.00 | Transactions per month: ~1,000,000 |
| Estimated Yearly turn-over: | $200,000,000 |
| Average delivery time of goods (if applicable): | 2-3 DAYS |
| Average chargeback rate for the last 6 months: | 1.8 % |
| Average refund rate for the last 6 months: | 11.5 % |

I, authorized signatory of the above company. Hereby certify that all the information provided above in true and correct to the best of my knowledge.

| |
|---|
| Signature of Principal: *[signature]* |

*If more than one Principal, please complete this for each Principal*

## AUTHORIZED CONTACTS

Please provide below all persons that are authorized to communicate with the processing company.

### Authorized Contact Information

| Full Name: | | JESSE D. WILLMS |
|---|---|---|
| | Position: | SOLE OWNER / CEO |
| | Phone No.: | 780-457-1624 |
| | Email: | d.jesse2@yahoo.com |
| List any information restrictions here: | | |

| Full Name: | | MIKE. STEFANIUK |
|---|---|---|
| | Position: | TECHNICAL SUPPORT |
| | Phone No.: | 780-416-0211 |
| | Email: | mstef@live.ca |
| List any information restrictions here: | | |

| Full Name: | | |
|---|---|---|
| | Position: | |
| | Phone No.: | |
| | Email: | |
| List any information restrictions here: | | |

### Department Contacts

| Billing Dept. Contact: | PHYLIS PLESTER |
|---|---|
| E-mail: | plester2@shaw.ca |
| Phone No.: | 780-416-0211 |
| Technical Dept. Contact: | MIKE STEFANIUK |
| E-mail: | mstef@live.ca |
| Phone No.: | 780-416-0211 |
| Chargeback Dept. Contact: | SUSAN ROY |
| E-mail: | susan@justthinkmedia.ca |
| Phone No.: | 780-416-0211 |

The above persons are authorized to receive any and all information, including but not limited to, processing history and financial data, confidential or not, that may be requested from time to time. (unless otherwise stated above.

In the event a change is made to the company, staff or otherwise, I will inform the processing company, in writing, within 24 hours of said change. (processing company will not be liable for any information not relayed)

PRINCIPAL's Signature: _____     Date: JUNE 2, 2009

Print Name: _____ JESSE D. WILLMS _____

## CONFIDENTIALITY

I, JESSE D. WILLMS , principal of IORIOR ALBERTA LTD.(company) have or soon will commence discussions leading to a possible contractractual agreement or other business combination. I acknowledge that the confidential information shared in connection with any such discussions are of a highly confidential nature and agree that such materials and information will not be reproduced, distributed or disclosed to any other person or entity, directly or indirectly. No party to the agreement will attempt to circumvent any relationships introduced or discussed. All affiliates, advisors, and consultants shall be advised of the Confidentiality Agreement and such advisors and consultants shall agree to the foregoing confidentiality pledge as a condition to receiving any Confidential Information.

I acknowledge and agree that in the event a business combination between the respective companies is not consummated then the Confidential Information revealed by each party shall remain the exclusive property of the party revealing such Confidential Information. Neither party shall attempt to us, usurp or otherwise benefit, directly or indirectly, from the Confidential Information disclosed or revealed by the other and shall not solicit, contact, communicate with, use or employ any of the persons, entities, businesses, vedors, relationships, ideas or concepts of the other or make any attempt to do so, directly or indirectly, whether as a principle, agent, consultant, partner, member or shareholder.

I acknowledge and agree that the harm that would be suffered in the event of any breach or threatened breach of this agreement, cannot be compensated by monetary damages alone and that injective relief shall be an appropriate remedy therefore. The parties agree that venue for any action, which is commenced to interpret or enforce the terms and provisions of this Agreement, shall lie in the Country of the processing company.  If any action is threatened or commenced to interpret or enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs of suit from the other.

°If more than one principle owner, print additional copy

PRINCIPAL's Signature: _____   Date: JUNE 2, 2009

Print Name: _____JESSE   D. WILLMS_____

TERMS

I, _JESSE D. WILLMS_, the undersigned representative and authorized signatory of _10-2101? ALBERTA LTD._ (Company), do hereby certify that all the information provided is true and correct to the best of my knowledge.

I further certify, that I have read and understand the enclosed material and as such have signed all pages hereto.

TERMS ACCEPTED by CLIENT

_____
Signature of Principal/Authorized signator

JUNE 3, 2009
Date

_JESSE D. WILLMS_
Printed Name

CEO
Title


RBC
Royal Bank

Royal Bank of Canada
Sherwood Park Branch
160 - 390 Baseline Road
Sherwood Park, Alberta T8H 1X1
Tel.:   780-449-7700
Fax.:   780-449-7722

Dec 30, 2008

To Whom It May Concern:

Please be advised that Jesse Willms has been a client of RBC since June 2005.

Mr. Willms is a high valued client and has an excellent relationship with us.

All accounts have been maintained in a most outstanding manner.

We trust that this is the information you require.

Yours truly,

Colleen Bird
Manager Client Care

Page 23

# 1021018 Alberta Ltd.

#240, 11 Athabascan Avenue
Sherwood Park, AB
T8A 6H2

PHONE: (780)416-0211                                    FAX:    (780)416-0216

June 2, 2009

To Whom It May Concern:

### Re:  1021018 Alberta Ltd. dba Just Think Media

1021018 Alberta Ltd. is an eCOMMERCE Company offering a variety of products and services online selling directly to the Consumer.  Our main products are dietary supplements and cosmetics.  We offer a 60 day money back guarantee for a full refund.

Should you require further information, please don't hesitate to contact us.

Sincerely,

Jesse D. Willms
CEO
JDW/php

 Corporation/Non-Profit Search
Corporate Registration System

Date of Search:        2006/08/03
Time of Search:        10:54 AM
Search provided by:    REGISTRY ON WYE LTD.

Service Request Number:    8975424
Customer Reference Number:

Corporate Access Number: 2010210181
Legal Entity Name:       1021018 ALBERTA LTD.

Legal Entity Status:     Active
Alberta Corporation Type: Numbered Alberta Corporation
Registration Date:       2002/12/09 YYYY/MM/DD

Registered Office:
Street:        2500, 10104 - 103 AVENUE
City:          EDMONTON
Province:      ALBERTA
Postal Code:   T5J 1V3

Directors:

Last Name:         WILLMS
First Name:        JESSE
Street/Box Number: 79 CHARLTON DRIVE
City:              SHERWOOD PARK
Province:          ALBERTA
Postal Code:       T8H 1R5

Voting Shareholders:

Last Name:         WILLMS
First Name:        JESSE
Street:            79 CHARLTON ROAD

City:                          SHERWOOD PARK
Province:                      ALBERTA
Postal Code:                   T8H 1R5
Percent Of Voting Shares: 100

**Details From Current Articles:**

The information in this legal entity table supersedes equivalent electronic attachments

| | |
|---|---|
| Share Structure: | THE ATTACHED SCHEDULE "A" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Share Transfers Restrictions: | THE ATTACHED SCHEDULE "B" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Min Number Of Directors: | 1 |
| Max Number Of Directors: | 7 |
| Business Restricted To: | NONE |
| Business Restricted From: | NONE |
| Other Provisions: | THE ATTACHED SCHEDULE "C" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |

**Associated Registrations under the Partnership Act:**

| Trade Partner Name | Registration Number |
|---|---|
| EDIRECTSOFTWARE | PT11768397 |

**Other Information:**

**Last Annual Return Filed:**

| File Year | Date Filed (YYYY/MM/DD) |
|---|---|
| 2005 | 2006/02/13 |

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 2002/12/09 | Incorporate Alberta Corporation |

| 2005/12/02 | Change Director / Shareholder |
|---|---|
| 2006/02/13 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |

Attachments:

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Share Structure | ELECTRONIC | 2002/12/09 |
| Restrictions on Share Transfers | ELECTRONIC | 2002/12/09 |
| Other Rules or Provisions | ELECTRONIC | 2002/12/09 |

This is to certify that, as of this date, the above information is an accurate reproduction of data contained within the official records of the Corporate Registry.



CORPORATE ACCESS NUMBER: 2010210181



BUSINESS CORPORATIONS ACT

# CERTIFICATE

# OF

# INCORPORATION

1021018 ALBERTA LTD.
WAS INCORPORATED IN ALBERTA ON 2002/12/09.





Articles of Incorporation
For
1021018 ALBERTA LTD.

| | |
|---|---|
| Share Structure: | THE ATTACHED SCHEDULE "A" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Share Transfers Restrictions: | THE ATTACHED SCHEDULE "B" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Number of Directors: | |
| Min Number of Directors: | 1 |
| Max Number of Directors: | 7 |
| Business Restricted To: | NONE |
| Business Restricted From: | NONE |
| Other Provisions: | THE ATTACHED SCHEDULE "C" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |

Registration Authorized By: NORMAN J.K. BISHOP
SOLICITOR

# REGISTER TRADE NAME - Proof of Filing

## Alberta Registration Date: 2008/12/03

## Registration Number: TN14408645

Service Request Number: 12432191
Trade Name:             JUST THINK MEDIA
Type of Business:        ECOMMERCE MARKETING AGENCY
Business Location:       ALBERTA
Commencement Date:     2008/07/01

### Declarant

Status:                       Active
Declarant Type:           Legal Entity
Corporate Access Number:     2010210181
Last Name / Legal Entity Name: 1021018 ALBERTA LTD.
Street:                     #2500, 10104 - 103 AVENUE
City:                       EDMONTON
Province:                 ALBERTA
Postal Code:             T5J 1V3

Registration Authorized By: SCOTT R. TILLEY
                             SOLICITOR

of 1

12/3/2008 12:45 PM



ΚΥΠΡΙΑΚΗ
REPUBLIC

ΔΗΜΟΚΡΑΤΙΑ
OF CYPRUS

HE 194251

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF
COMPANIES AND OFFICIAL RECEIVER
NICOSIA

12 April, 2007

### CERTIFICATE

COASTWEST HOLDINGS LIMITED

It is hereby certified that, in accordance with the records kept by this Department, the following are the Directors and Secretary of the above Company:

| Directors | Country of Nationality |
|---|---|
| **JESSE DAVID WILLMS** <br><br> Charlton Road, 79 <br> SHERWOOD PARK AB <br> T8H 1R5 Alberta, Canada | Canada |
| **MILITSA SYMEOU** <br><br> Eirinis, 1 <br> Lythrodontas, P.C. 2565, Nicosia, Cyprus | Cyprus |

| Secretary | Country of Nationality |
|---|---|
| **DILEA SECRETARIAL LIMITED** <br><br> Athinodorou, 3 <br> Dasoupoli, Strovolos, P.C. 2025, Nicosia, Cyprus | |

For Registrar of Companies

KYΠPIAKH
REPUBLIC
ΔHMOKPATIA
OF CYPRUS

HE 194251

MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
DEPARTMENT OF REGISTRAR OF
COMPANIES AND OFFICIAL RECEIVER
NICOSIA

12 April, 2007

### CERTIFICATE

### COASTWEST HOLDINGS LIMITED

It is hereby certified that, in accordance with the records kept by this Department the following are the Shareholders of the above Company :

| Names and Addresses | Class (value) | No. of Shares |
|---|---|---|
| JESSE DAVID WILLMS<br>Charlton Road, 79<br>SHERWOOD PARK AB<br>T8H 1R5 Alberta, Canada | ORDINARY ( CYP 1,00 ) | 1000 |

for Registrar of Companies

KYΠPIAKH         ΔHMOKPATIA
REPUBLIC         OF CYPRUS

HE 194251                MINISTRY OF COMMERCE, INDUSTRY AND TOURISM
                              DEPARTMENT OF REGISTRAR OF
                              COMPANIES AND OFFICIAL RECEIVER
                                        NICOSIA

                                      12 April, 2007


                                      CERTIFICATE

                          COASTWEST HOLDINGS LIMITED


   It is hereby certified that, in accordance with the records kept by this Department,

the Registered Office of the above Company is situated at:



Vasilissis Freiderikis, 33
1st floor
P.C. 1066, Nicosia, Cyprus



                                    For Registrar of Companies

REPUBLIC OF CYPRUS

HE  194251

HE 44

THE COMPANIES LAW, CAP. 113
Section 15(1)

CERTIFICATE OF INCORPORATION

IT IS HEREBY CERTIFIED that,

**COASTWEST HOLDINGS LIMITED**

has this day been incorporated under the Companies Law, Cap. 113 as a Limited
Liability Company.

Given under my hand in Nicosia on the 13th of March,  2007

(Sgd.) S. G. KOKKINOS
..............................................
Registrar of Companies

TRANSLATED TRUE COPY
(Sgd.) EPIPHANIOU
for Registrar of Companies
14 March, 2007



EXHIBIT 4

----- Original Message -----
From: Mike Stef <mstef@live.ca>
To: <abc@2opus.com>
Subject: RE: Processing Reports
Date: Thu, 19 Nov 2009 13:09:36 -0700

>Blake,
>
>Upon review of the "Processing Terms & Agreement" I have
>noticed the the fee's mentioned are not what was originally
>agreed upon.
>
>Also, I don't feel this document is not necessary, as we
>have already signed a similar agreement.
>
>Thanks,
>Mike Stef
>
>VP, Engineering
>
>mstef@live.ca
>
>
>
>780.906.0371 Mobile
>
>780.416.0211 Office
>

A Member of:

## *Processing Terms & Agreement*

**These Terms and Agreement is made on this _____ day of _____ 20____ and shall be effective upon execution by both parties as of the date first written above.**

Whereas, _____ Client hereby warrants and declares that it is engaged in a lawful business
   *(Insert Corporate Name)*
and is duly licensed under the laws of the Country, Province, State, County, and City disclosed by Client on the Client Application and any other laws and regulations applicable to Client, to conduct business.  Client warrants that neither it nor any of its officers, directors or owners has been terminated, by any other bank or processor in connection with any agreement regarding similar electronic transaction processing.

Whereas, Client desires Agent to provide, whether by itself or through third parties, a communications connection with Client for the processing of electronic transactions.  Client Acknowledges that in addition to paying a fee for such services, Client will bear the credit risk of such sales activities by Agent and/or Agents affiliates or companies, as well as any liability related to the products or services sold under contract with Agent.  Client hereby appoints Agent as its Agent for the sale of Client's goods or services through gateway transactions.  In this capacity, Agent shall use commercially reasonable efforts to maintain its Agent processing capability at all times for the timely and efficient completion of transactions.

Whereas, Agent, its affiliates, or other companies contracted with Agent are engaged in the business of electronic transaction processing and have experience in the sale of distribution of goods and services to the public through the Internet.  Agent shall provide Client with data transmission capability (gateway connectivity services) to enable Client to make and complete all such sales.

Therefore, in consideration of the representations, covenants and promises made herein, the receipt and sufficiency of which is hereby acknowledged, Agent and Client do hereby agree as follows:

### TERMS and AGREEMENT

This Agreement, as well as all other documents executed by Client, as required by Agent for acceptance of Client's card transactions, including all schedules, applications, supporting documentation and exhibits (as amended and/or added from time to time with prior written consent of Agent", all of which are deemed incorporated herein and are integral part hereof, constitute the entire agreement between Agent and Client.

Client hereby represents and warrants to Agent that all information provided by Client is true, complete and correct in all respects.  Client fully understands, agrees and acknowledges that Agent is expressly and directly relying on this representation and warranty in agreeing to enter into this Agreement and to provide services hereunder.

Client further acknowledges and consents that Agent may provide financial transaction processing to Client hereunder through contracts and/or subcontracts with third parties engaged in a part or all of the business of electronic transaction processing and authorization and that Agent provides and may continue to provide services (of any kind whatsoever) to third parties, regardless of their location or their business.

Subject to the termination rights contained elsewhere in this Agreement, the Term of this Agreement shall be one (1) year from the date first written; provided that the Agreement shall be automatically renewed for one (1) year terms unless either party gives the other party notice of its intention not to renew at least sixty (60) days prior to the last day of the current term, in which event the last effective date of the Agreement shall be the last day of the then current term.

Client may terminate this Agreement at any time by sixty (60) days prior written notice to Agent. Agents may terminate this Agreement immediately, at any time with or without cause and at its sole and absolute discretion.

Upon the effective date of termination, Agent will no longer process card transactions for Client, but shall continue to process refunds and chargeback's until such time as the holdbacks have been fully released.  Notwithstanding the foregoing statement, Agent shall be entitled to all fees and amounts for transactions processed after the effective date of termination, for any reason whatsoever.  Agent may withhold any and all amounts to cover anticipated chargeback's, fines, fees etc.  Any remaining amount will be released within twelve (12) months from the date of the last transactions.

In the event that any claim, suit or proceeding is commenced by or against the Client under any Federal or State law dealing with insolvency, bankruptcy, receivership or other debt relief, the Agreement shall simultaneously therewith automatically terminate with retroactive effect to the date of commencement of such claims, suit or proceeding, without requiring any notice to Client. In such event, any amount due to Agent shall accelerate and become immediately due and payable, without the necessity of any notice, declaration or other act whatsoever by Agent.

### CONFIDENTIALITY

Agent and Client each acknowledge and agrees to, expect as otherwise required in order to realize or fulfill any of the rights or undertaking hereunder, as the case may be, Agent and Client shall keep strictly confidential the information or material that is commercially valuable to the other and not generally known in the industry.  Confidential information includes but is limited to: any and all versions of proprietary computer software or

documentation related thereto, technical information concerning products and services, product data and specifications, know-how, formulae, diagrams, flow charts, drawings, source code, object code, program listing, test results, processing, inventions, research projects and product development, any and all versions of any designs, patents, trademarks or copyrightable works, discoveries, manufacturing techniques, trade secrets, business plans, cost information, profits, sales, information concerning employees, owners, directors, any other information not generally known to the public of by actual or potential competitors of Agent or Client, which, if misused or disclosed, could reasonably be expected to adversely affect either party's business.

Client shall not identify Agent in any of its advertising, promotional or selling material, except to the extent approved in advance in writing by Agent which approval may be withheld in Agent's sole discretion.

Notwithstanding, the aforementioned, it is clarified that Agent shall be entitled to use any such confidential information in order to process the transactions under this Agreement. Neither party has any duty of nondisclosure with respect to confidentiality information that was in such party's possession or already known to such party without an obligation to keep it confidential, before such information was disclosed, is publicly available at the time of disclosure or that becomes publicly available after disclosure other than through breach of this Agreement or other wrongful act.

## COMPLIANCE

Client warrants that it will not conduct any card transactions that are not in compliance with this Agreement, Rules and Regulations of the Card Associations, Governmental or Judicial.

Client agrees to submit only transactions whereby cardholders purchased from Client the goods or services set forth in the Client Application.

Client agrees to fulfill and comply with, without limitation, all provisions of Merchant Agreement and any appendices, exhibits or schedules thereto, as may be amended from time to time, in general and particularly in connection with transaction with respect to which Agent grants its services hereunder.

Notwithstanding any other provisions hereof, Client acknowledges that the services provided by Agent hereunder are and shall continue to be based and conditional upon the accuracy of its representations during the entire term of this Agreement.

## PAYMENTS

Agent shall receive the proceeds of all Client transactions. Agent shall pay to client weekly; starting two weeks in arrears (subject to conditions hereto) the net proceeds of all such sales. For the purpose hereof, "net proceeds" means the amount received by Agent less, to the extent not therefore deducted: (a) discount; (b) all fees then due and payable by Client to Agent; (c) all chargeback's; (d) all credit backs; (e) the reserve specified below, and (f) all transaction fees, other fees, fines, penalties, charges and other items payable by Client to Agent hereunder.

In the event of a weekend and/or bank holiday(s), the remittance date shall be postponed by the intervening number of days. However, due inter alias, to delays and errors of the electronic networks involved, Agent does not guarantee the timeliness with which any payment may be credited to the Client's bank account.

In the event of delay or non-receipt of remittances, the Client agrees to assist Agent in resolving any problems correctly and promptly crediting Client's bank account, as detailed in the Merchant Application. Client shall provide Agent with the written notice of any change to its bank account within 48 hours of such change or client will be responsible for all wire traces, returns and any other bank fees associated due to lack of prior notice to agent.

Payments are processed on Thursdays each week, pending processing history and as specified in this agreement, with two positive processing periods in arrear. For the purpose of this agreement, positive processing period means Wednesday through Tuesday. Delays in payments may occur during bank, national and international holidays. It is clarified that the Client shall pay any additional wiring or transfer charges imposed by the banks on the remittances.

Client settlements are based on a minimum wire of $1,000.00 and are based on consistent processing, should Client reduce or increase volume in one extreme or the other, Agent in its sole and absolute discretion, may reduce or withhold settlement(s) based on the Internal Risk Factors.

The rolling reserve (held by the bank) shall be in an amount of ten (10) percent of the gross proceeds from Client's transactions. Agent and its affiliates may adjust the reserve rate at any time, without notice, at its sole but reasonable discretion. Agent shall pay the reserve to client not later than twelve months following the termination of this agreement and from the date of the last activity on the account for any reason whatsoever after deducting there from all amounts owed by client to agent in accordance with this agreement; and as specified below.

If Client does not have a credit balance which can be offset, Client undertakes to pay to Agent all amounts it was charged within 14 days after receiving a demand for payment from Agent.

## CHARGEBACKS

Agent shall cooperate to the best of its ability with Client and with the Card Associations and Banks to affect timely all chargeback's and credit backs and to minimize the amount thereof from time to time.

Agent shall deduct from current processing proceeds and if such net proceeds are inadequate, from the reserve, all chargeback's and credit backs

claimed by a customer that purchased Client's goods or services through transactions plus associated fees.

On notification of a chargeback, Agent shall deduct the amount thereof, plus the chargeback fee set forth in the Merchant Application and hereunder, from the next payment of net proceeds due to Client and if such proceeds are not adequate, then from the reserves.

Agent may terminate this Agreement at any time should the sum of chargeback's during any thirty (30) day period, ever exceed one (1) percent of net sales transactions of Client's good or services. The discount rate will increase to fifteen percent on all processing services if the chargeback rate exceeds one and one half percent during any settlement (processing) period. If chargebacks exceed one percent in any settlement (processing) period a risk management fee of $125.00 will be accessed on a per chargeback basis. If chargebacks exceed four percent in any settlement (processing) period a risk management fee of $200.00 will be accessed on a per chargeback basis. Should the chargeback rate exceed two percent in any settlement (processing) period, the reserve balance maybe forfeited in full at the Agents sole but reasonable discretion.

Client whether consented to or not by cardholder, shall not present to Agent for processing any sales representing a transaction that has been previously charged back or credited back to Agent and returned to Client.

## RATES & FEES

Agent's fee schedule for its services as client's agent is set forth in the Merchant Application and hereunder. Client shall pay all such fees to Agent in the amounts and at the times specified. Agent shall deduct as specified in this agreement from each processing period any and all fees due to Agent. Agent shall have the right at any time and from time to time upon written notice within seventy-two (72) hours to change any and/or all fees. Fees described in this agreement are in USD only.

Client shall pay all fess to Agent in the amounts specified in the application and hereto. Client will have online access to view all statements, twenty-four hours, seven days a week for a fee of $25.00 per processing period. The annual fee and setup fee have been waived. Client shall also pay agent the below agreed upon rates and fees and as set forth in this agreement.

Discount rate of 6.95%, transaction fee per occurrence of $.70; credit back/refund per occurrence of $4.00; chargeback fee per occurrence of $35.00; express settlement fee per occurrence of 0.15%; wire processing fee per occurrence (and any application international fees) of $35.00; third party confirmation, or transaction verification may incur at the exclusive discretion of agent at a rate of $3.00 per occurrence.

## TAXES

Each party agrees to report and pay its own taxes imposed on its income by any jurisdiction. Should Agent be required to pay any such taxes on the income of Client, the amount of such taxes and all related interest, fines, or penalties shall become immediately due and payable to Agent. The parties agree that if excise, sales, use taxes are imposed on the transactions contemplated under this Agreement, the burden of such taxes shall be Client's responsibility.

Agent shall have the right to collect and pay all taxes in the nature of an excise, sales or use tax on behalf of Client if reasonably required to do so by taxing authority of competent jurisdiction and shall further have the right to recover from Client, and Client hereby agrees to pay, the full amount of any such taxes and related penalties and interest which are paid by Agent with its own funds.

Agent shall have the right to verify all transactions and to examine Client's books, records and other papers that are directly related to, and limited to, the card transactions covered by the terms of this Agreement. For this purpose, Client shall preserve all records pertaining to such transaction for a period of at least three (3) years from the date of the termination or expiration of this Agreement for any reason.

## COST AND SERVICE CHARGE INCREASES

Upon thirty (30) day written notice to Client, or less if so deemed necessary by Agent, Agent shall have the right to reasonably adjust charges as necessary to offset any direct or indirect increase to Agent in the costs or providing services hereunder including but not limited to, increase in the cost of living index or due to changes in rules, regulations, or operating procedures of banks or other applicable card organization, or any additional requirement imposed by any applicable International, Federal, or State government agency or regulatory authority, or due to any increase in communication costs charged to Agent. Such increase shall become effective as of thirty (30) days following written notice thereof, or less if deemed necessary by Agent.

Agent shall have the right to reasonably increase the Discount Fee, Reserve percentage and/or Transaction Fees if Client or Client's transactions do not satisfy eligibility requirements for a minimum interchange fee, in which case Agent will provide Client details of such non eligibility as soon as possible, or if Agent reasonably believes such increase is necessary in order to protect its interest, in light of Client's business or developments with regards to its business. Client acknowledges that fees and rates charged to it hereunder may vary as a consequence of variable charges incurred under bank programs and other applicable bank cards as each may change from time to time; provided that Agent provide Client as much prior notice as reasonably possible. Notwithstanding anything to the contrary contained in this Agreement, any and all rate increases shall apply only to card transactions from the date of notice and not those occurring before the date of notice.

## WARRANTS AND REPRESENTATIONS OF CLIENT

Client warrants that at all times shall fully operate and comply its business in strict compliance with all applicable International, Federal, State and

local laws, rules and regulations applicable to it under any jurisdiction, as mended from time to time. Client further warrants that it shall supply and execute any documents, authorizations, and/or power of attorney (in whatever format) that are deemed necessary by Agent, at its sole discretion, for the purpose of providing the services set forth under this Agreement and/or as needed.

Client's usual trade or business is shown in the Merchant Application. Client shall not change its usual trade or business or commence operating an unrelated trade or business on the same premises or using the same corporate structure as Client operates this stated trade or business without obtaining written consent from Agent to the change or addition.

Client shall not use the processing services or any of Agent's services in connection with any illegal or fraudulent business activities. Client shall not permit or authorize any other person to use the processing services provided under this Agreement.

Client does, and at all times shall, accurately, plainly, and completely describe products or services, the prices and terms on which they are being sold, the action that must be taken to consummate a purchase, the point at which a sale is final and irreversible, and any rights a customer may have to return, obtain a refund or terminate a transaction, and the procedures for achieving same, including a clearly identified and easily accessible cancel link on the entry, join or payment page of the Client's website.

Client shall not make or give any promises, warranties, guaranties or representations concerning the performance by Agent of its obligations hereunder.

Client at its sole expense shall conduct the promotion and marketing of its goods and/or services with all due care and diligence and shall cultivate and maintain good relations with customers and clients and potential customers and clients in accordance with sound commercial principles and practices

Client has all licenses required, if any, to conduct its business and is qualified to do business in every jurisdiction where it is required to be so qualified. Client has the power to execute, deliver, and perform this Agreement, this Agreement is duly authorized, and does not and will not violate any provisions of law, or conflict with any other agreement to which the Client is subject or with Client's incorporation documents.

Client does, and at all times shall, timely deliver all goods and perform all services advertised or otherwise agreed by Client, for the price and on the terms advertises or agreed. Client's website does not, and at all times will not, contain any file, data stream, messages, pictures or communications of any kind which is harmful, violent, threatening, abusive, hateful or contain viruses, worms, "Trojan Horses", or any other destructive features, regardless whether damage is intended or unintended.

Client undertakes that written notice to Agent shall be given in the event of any change of address or ownership of Client or transfer of substantially all of the assets is undertaken by Client. All the information supplied by Client to Agent on its Merchant Application is true and correct on the date hereof and shall remain true and correct throughout the Term of this Agreement.

## INDEMINIFICATION

Client and the Guarantors (as hereinafter defined) shall jointly and severally defend, indemnify and hold harmless Agent, its employees, officers, agents, directors, shareholders and successors, from any and all taxes, penalties, judgments, losses, claims, actions, complaints, damages, expenses and other liabilities, including attorney's fees, which arise as a result of Agent's involvement with Client under this Agreement or otherwise or which pertain to the conduct, products, services, statements, programs, contracts, promotions and/or advertising offered by Client including but not limited without limitation, tort claims and violations of intellectual property rights. Agent assumes no liability for Client's failure to comply with the terms of this Agreement. Agent assumes no liability for any act, omission or negligence of Client, its subcontractor(s), agent, employees, or directors.

Client understands and agrees that in the event that Agent reasonably estimates that it may be entitled to be indemnified hereunder, then Agent reserves the right to off-set (without derogating from any other right) against Client's account or against the reserve amount to the extent necessary to compensate Agent for any and all costs and expenses, including reasonable attorney's fees, which may result from Agent's involvement in the applicable legal or administrative proceeding. In furtherance and not in limitation of the foregoing, Client acknowledges and agree to indemnify Agent for any and all legal fees and costs incurred by Agent in reference to or in any manner arising out of Client's obligations under this Agreement, said claim rightfully or wrongfully asserted against Agent. This obligation of Client shall arise and bind the Client regardless of whether or not litigation against Agent is actually instituted and shall include all sums paid by Agent, in its sole judgment and discretion, to any third-party to compromise an asserted claim prior to the commencement of litigation, during litigation, or to satisfy any monetary judgment against Agent, or any sums incurred by Agent to allow it to comply with an injunctive directive of a court order or of a settlement.

## LIMITATION OF LIABILITY

Agent shall only be liable for its own acts of gross negligence of willful misconduct in the performance of its services. Agent assumes no liability for any other acts or omissions or for the acts or omission of others with which Agent works to perform its services contemplated hereunder. Agent assumes no liability for disruption of services for any reason including, without limitation, power or telephone service outages, internet disruptions, vendor disruptions, equipment failure, fire, flood, extreme or severe weather conditions, force majeure, vandalism, technical difficulties, hackers, sabotage and theft. Agent shall in no event be responsible for indirect, special, incidental, consequential, punitive or exemplary damages or losses of any kind under any circumstances, including lost profits (whether or not Agent has been advised of the possibility of such damage or loss ) by reason of any act or omission in its performance hereunder. Without derogating from the aforementioned, in no case shall Client be entitled to recover damaged from Agent which exceed the sum of the amounts retained by Agent under this Agreement during the month prior to the event giving rise to claim for damages.

## NOTICES

Any notices, demand, requests and other communications which are required or permitted to be given hereunder shall be validly given if set forth in writing and delivered by hand against receipt, mailed by certified mail, return receipt requested, confirmed email, to the parties hereto marked "Personal and Confidential" and addressed to the addressed below. Notwithstanding the foregoing, unless objected to in advance by a party hereto, a notice pursuant to this Agreement, or in connection with it, may be sent by facsimile transaction or via email and shall be deemed validly given.

Notice will be deemed given on the date in person or on the fifth (5th) day following the date of which they were deposited, postage prepaid, mail or equivalent.

## EXPENSES

Each party will pay all fees and expenses of such party's own counsel, accountants, and other representative and all other expenses incurred by such party in the negotiation, preparation, and execution of this Agreement and the consummation of the sale, including any finder's or brokerage fees for which it is responsible.

## COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. In the event of any variation or discrepancy between fully executed copies of this Agreement (including any exhibits). Agent's copy shall control. Additionally this Agreement and all notices hereunder may be executed by telecopy or emailed signatures, the delivery of which shall be binding and effective for all purpose.

## ATTORNEY'S FEES AND COSTS

If suit, action or proceedings is brought to enforce or interpret any provisions of this Agreement, or the rights or obligations of any party hereto as they relate to the subject matter of this Agreement, the prevailing party shall be entitled to recover, as an element of such party's costs of suit, and not as damages, all reasonable costs and expenses incurred or sustained by such prevailing party in connections with such suit, action, arbitration, litigation or other expenses, fees, including, without limitations, attorney's fees and expenses and court costs.

## DISPUTE RESOLUTION

This Agreement and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws in the country of the Agent as if the contract was made and wholly performed there without giving effect to the conflict of laws and rules thereto. The party's rights and remedies hereunder shall be cumulative, and the exercise of any one or more shall not preclude the exercise of any other(s). Should a dispute arise concerning the terms and conditions of this Agreement, or the breach of it by any party hereto, the parties agree to submit their dispute for resolution by final and binding arbitration in accordance with the standard rules of arbitration as predominantly used and applicable. The place of arbitration shall be the country of the Agent and the arbitration shall be final and binding.

## SERVABILITY

The invalidity or unenforceability of any provision of this Agreement, as so determined by a court of competent jurisdiction, shall not affect the validity or unenforceability of any other provision hereof or the valid and enforceable portion of such provision. This Agreement shall be construed in all respects as if such invalid or enforceable provision were omitted.

## CONSTRUCTION

Captions and headings in this Agreement are for reference only and shall not be used to interpret or construe this Agreement. All currency referred to in this Agreement, and all payments to be made under this Agreement shall mean and be paid in US $ (United States Dollars).

## MODIFICATION

Except as hereinafter provided, no amendment or modification of this Agreement shall be valid unless it shall be in writing and signed by each party hereto. Notwithstanding the aforementioned, upon ten (10) days written notice, Agent may reasonably amend this Agreement to reflect changes in law or regulations or to comply with the changes imposed on Agent, and to make other changes deemed reasonably necessary by Agent, provided that such changes do not materially alter the ongoing rights and obligations of the parties.

## FORCE MAJEURE

If Agent is unable, due to events beyond its control, to perform its Agent Processing services with respect to the Transactions, such inability shall not constitute a breach of this Agreement nor subject Agent to any liability to Client, and the time provided for performing such obligations shall be extended by a period of time equal to the duration of such events. Events beyond Agent's control include, but are not limited to, acts of God, war, civil commotion, labor disputes, equipment failures, power shortages, strikes, fire, flood or other casualty, shortages of labor or material, government regulation or restriction, weather conditions, breaches or failures to perform by third parties, technical problems, including hardware and software defects and crashes and other malfunctions, disruptions on account of or caused by vandalism, theft, phone service outages, Internet disruptions, and

mechanical, power or communication failures. If, after the date of this Agreement, any Applicable Law, Compliance, Regulation or Rule becomes effective which substantially alters Agent's ability to perform Agent Processing services for transactions either generally or for Client's good or services, Agent shall have the right to terminate this Agreement, with notice, if possible, effective upon the earlier of, the date upon which Agent shall be unable to perform its Agent processing services hereunder, or thirty (30) days following written notice; and Agent shall have no liability to Client with respect thereto except to the extent contemplated herein.

## ENTIRE AGREEMENT

This Agreement, Merchant Application, and all documents referred to, constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and supersedes all other agreements, representations, negotiations and understandings relating to the subject matter, whether written or oral.

By executing this Agreement in the space provided, the person signing this Agreement on behalf of the Client represents to the Agent that Client's governing body or person has authorized Client to enter into this Agreement, to appoint Agent as contemplated hereby and to assume the duties and obligations set forth herein, has authorized the signatory hereto to execute and deliver this Agreement on behalf of Client and to thereby bind Client to the terms and conditions hereof, that Client is legally authorized to own and operate the website(s), and that Client has obtained all necessary regulatory approvals and certificates to provide its products and services.

This Agreement shall not be effective until it has been signed by Agent and Agent has received and approved completed supporting documentation, application from Client. Until then, Client's execution and delivery of this Agreement shall only constitute an offer, contingent on acceptance by Agent.

## DEFINITIONS

AFFILIATES means any entity under common control, controlling or controlled with Agent

BANK means any member of Visa and/or MasterCard that has Agent directly or indirectly as the agent to provide card services or that issue cards

CARD or CREDIT CARD means a valid credit card or debit card in the form issued under license from Visa or MasterCard, or any other valid credit, charge or debit card acceptance by Client with Agent's prior written approval

CARD ASSOCIATION means Visa or MasterCard or any other card approved by Agent

CARDHOLDER means the end user that uses his or her card to make purchases of Client's goods or services. The end users name is embossed upon the face of the card

CHARGEBACK(s) means a credit to the account of the cardholder that is issued by the cardholder's issuing bank to reverse all or a portion of a sales transaction whether at the request of the cardholder or the issuing bank

CHARGEBACK FEE means the fee as set forth herein of this Agreement that Agent will charge Client for each chargeback resulting from this Agreement

CLIENT APPLICATION means the application submitted by Client to Agent in order to receive services as set forth in this Agreement

COMPLIANCE means any and all requirements which must be complied with by Clients at all times, including, without limitation, the requirements set forth in this Agreement, all Card Association rules, all applicable laws, all modifications and amendment thereto

CONTRACTING COMPANY means a provider that holds a merchant account and agrees to accept Client's products and services into its sales and distribution programs as arranged by Agent

CREDIT BACK means an improper Customer Charge that is reversed by Agent, Affiliate or Contracting Company

DISCOUNT FEE means the fee per card transaction that Agent will charge Client as set forth in the Rate Sheet and does not include chargeback, credit back or any other associated fees

RESERVES means the sum of money based on the Client's sales volume multiplied by the Reserves percentage which shall be withheld by the bank and not the Agent

RISK MANAGEMENT FEE means the fee as set forth in the Merchant Application and set forth herein of this Agreement, to offset the cost of chargeback management and chargeback reduction expenses

SERVICE STANDARDS means the policies and procedures that may be set forth from time to time by bank Card Association and Agent.

TRANSACTIONS means transactions to which customers utilize a card as a form of payment to Agent or Contracting Company for Client's goods and services and include all chargeback's and credit backs

WEBSITE means web pages that offer the Client's goods or services to be purchased by cardholders for which card transactions will be processed

IN WITNESS WHEREOF, the parties hereto have agreed to be bound by the terms and conditions of this Agreement, and executed this Agreement as of the date first written above.

**For and on behalf of CLIENT**

_____          _____

Authorized Signature                                    Print Name

_____          _____
Title of Signatory                                                Date and Stamp

**For and on behalf of AGENT**

_____          _____
Authorized Signature                                          Print Name

_____          _____
Title of Signatory                                                Date and Stamp

EXHIBIT 5

| From | Jesse Willms <jd.jesse@yahoo.com> |
|---|---|
| | (Add to address book) (Add to recent addresses) (Add to blacklist) |
| Date | 8/12/2009 6:08:37 am |
| To | ABC <abc@2opus.com> |
| Subject | Re: Jesse |
| Attachments: | |

default.htm

Yes, we have processed a lot, please keep me posted, I want to continue processing a lot, but I need to start seeing payments.

Jesse

--- On **Tue, 8/11/09, ABC *<abc@2opus.com>*** wrote:

> From: ABC <abc@2opus.com>
> Subject: Re: Jesse
> To: "Jesse Willms" <jd.jesse@yahoo.com>
> Date: Tuesday, August 11, 2009, 7:03 PM
>
> Jesse,
>
> I will contact the processor and bank tomorrow and find out.
>
> I did not know you were processing.
>
> Blake
>
> ----- Original Message -----
> From: Jesse Willms <jd.jesse@yahoo.com>
> To: abc@2opus.com
> Subject: Re: Jesse
> Date: Tue, 11 Aug 2009 09:47:37 -0700 (PDT)
>
> >Blake,
> >
> >When will we start receiving wires for our billing?
> >
> >Jesse
> >
> >--- On Fri, 7/10/09, Jesse Willms <jd.jesse@yahoo.com>
> >wrote:

EXHIBIT 6

```
>>>>> >Mike
>>>>> >> From: abc@2opus.com
>>>>> >> To: mstef@live.ca
>>>>> >> Subject: Re: Wires For CreditReportAmerica Account
>>>>> >> Date: Mon, 17 Aug 2009 18:00:44 -0800
>>>>> >>
>>>>> >> Mike,
>>>>> >>
>>>>> >> I don't send wires or do any of the reconsiliations
>>>>> >> or banking, the bank does this.
>>>>> >>
>>>>> >> I will make a call in the morning and check. I know
>>>>> >> a wire was sent last week.
>>>>> >>
>>>>> >> Blake
>>>>> >>
>>>>> >>
>>>>> >> ----- Original Message -----
>>>>> >> From: Mike Stef <mstef@live.ca>
>>>>> >> To: <abc@2opus.com>
>>>>> >> Subject: Wires For CreditReportAmerica Account
>>>>> >> Date: Mon, 17 Aug 2009 12:40:27 -0600
>>>>> >>
>>>>> >> >Blake,
>>>>> >> >
>>>>> >> >
>>>>> >> >I was just wondering if you transfered us over any
>>>>> >> >funds for our CreditReportAmerica Account?
>>>>> >> >
>>>>> >> >
>>>>> >> >
>>>>> >> >Thanks,
>>>>> >> >Mike
>>>>> >> >
>>>>> >>
>>>>>
>>>>>>_____
```